**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**E.C., ET AL.** **PLAINTIFFS**

**VERSUS** **CIVIL ACTION NO. 1:14cv-225-LG-JCG**

**MICHAEL SARACO, ET AL.** **DEFENDANTS**

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Come now the Plaintiffs, E.C., a Minor, by and through Shane and Andrea Cooley as Parents, Guardians and Next Friends and Shane and Andrea Cooley, Individually, through counsel, and files this their memorandum in support of their response to defendants' Motion for Summary Judgment as follows:

## I.

## INTRODUCTION

On September 17, 2011, E.C., a minor, was attacked and bitten by a dog owned by Michael and Amanda Saraco ("the Defendants"), at the Sun Roamer Campgrounds, outside of Picayune Mississippi. As a result of the attack, E.C. sustained serious and permanent injuries. On or about April 17, 2015, Defendants filed a Motion for Summary Judgment, contending that the matter should be dismissed. However, the Motion for Summary Judgment should be denied, as the Defendants knew or should have known of the animal's vicious and/or dangerous propensity and disposition to cause harm. The evidence clearly raises a genuine issue of material fact because: (1) there is testimony that the dog, Sky, exhibited a dangerous propensity to harm someone, specifically E.C.; and (2) there is additional evidence that the Defendants should have foreseen that Sky was likely to attack someone.

**II.**

**FACTUAL BACKGROUND**

The Cooleys moved into the Sun Roamers campground in April of 2010. The Saracos moved into the Sun Roamers campground around July 2011. Their camper was right across a small gravel road from the Cooleys' camper. At the time, the Cooleys had two young daughters, K.C., age seven, and E.C., age five. The Saracos had three children at the time. Since both families were living so close to each other and had small children, the families became acquaintances, and the children occasionally played together.

When the Saracos moved into the campground, they had their large dog, Sky, a male standard poodle. Sky had been the Saracos' family pet but had become a hunting dog for Michael Saraco.

On Saturday, September 17, 2011, the Saracos went out of town to do some shopping. They shopped for about four hours, including buying groceries, and they stopped at a restaurant and got dinner on their way back to the campground. During that time, Sky was being held inside the Saracos' camper. When the Saracos arrived home at about 4:00 p.m., Michael Saraco let Sky out, so that Michael and Amanda could unload their groceries. While they were unloading the groceries, one of their daughters asked if she could go over to the Cooleys' camper and play with the Cooley girls. She then left and went over to the Cooleys' camper.

As Michael and Amanda were putting the groceries away, five-year-old E.C. was invited to come over and play. The two girls, I.S. and E.C., walked over to where Sky was standing, and E.C. began to pet him. In response, Sky reared up and attacked E.C., knocking her to the ground.

E.C. began screaming, as Sky continued his attack. She suffered serious injuries to her face, right shoulder, arm, and side.

**III.**

**LAW AND ARGUMENT**

**A. Summary judgment Standard**

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the nonmoving party is entitled to judgment as a matter of law." *Fed R. Civ. P.* 56(c). The party seeking summary judgment carries the burden of demonstrating that there is no evidence to support the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In ruling on a Motion for Summary Judgment, the court is not to make credibility determinations, weigh evidence, or draw legitimate inferences from the facts for the movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, all evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed.2d 176 (1962).

**B. Mississippi law governing liability of an animal owners dictates liability on the part of Defendants.**

Under the dangerous-propensity rule, the Mississippi Supreme Court has stated that an animal owner will be exposed to liability for an attack by his or her animal when: (1) there is some proof that the animal has exhibited some dangerous propensity or disposition that the owner was aware of prior to the attack complained of; and, (2) there is proof that the owner reasonably

should have foreseen that the animal was likely to attack someone. *Poy v. Grayson*, 273 So. 2d 491, 494 (Miss. 1973). The Court noted that " '[t]he gist of the action has been characterized as the keeping of the animal with knowledge of its vicious disposition.' " *Id.* at 493 (quoting 4 Am. Jur. 2d *Animals* § 86 (1962)).

However, for Plaintiffs to prevail, it is not necessary to prove a specific aggressive purpose or a prior attack; indeed, even playfulness in the animal will suffice. In *Mongeon v. A. & V. Enterprises, Inc.*, 733 So. 2d 170, 170 (Miss. 1997), the plaintiff was attacked by two dogs while walking from her trailer to the washateria on the premises of the trailer park in which she resided. At trial, the plaintiff adduced testimony showing that another resident of the trailer park had informed the manager of the park that the dogs had growled at her on a previous occasion. *Id.* at 172. Trailer park management assured the complainant that the dogs would be tied up. *Id.* The jury found for the plaintiff, but the trial court granted a motion for judgment notwithstanding the verdict for the defendant. *Id.* at 171.

The Mississippi Supreme Court reversed the trial court's holding. In so doing, the Court looked to other jurisdictions, which had held that "'[a]ny tendency of a dog to injure persons, whether the dog acts from a purpose to do bodily harm, from ill-temper, or only playfulness, is a dangerous propensity for which a keeper who has reason to know of such habit will be liable.'" *Id.* (quoting *Boosman v. Moudy*, 488 S.W. 2d 917, 920 (Mo. Ct. App. 1972)). Put simply, any characteristic, habit, tendency, or proclivity of a particular domestic animal that might result in the animal causing injury to a human being may be considered a "dangerous propensity" for the purposes of establishing a prima facie case. *See e.g., Clark v. Clark*, 207 Pa. Super. 193, 215 A. 2d 293 (1965) (dog had habit of "tackling" people and causing them to fall). The animal's "intent in

engaging in the behavior that resulted in the injury is generally irrelevant. Even overly affectionate behavior may be considered to be a "dangerous propensity" if it results in injury to a person.

The Court likewise relied on *Farrior v. Payton*, 57 Haw. 620, 562 P. 2d 779, 786 (Haw. 1977), which held that a dog which had barked on numerous occasions at strangers on the property had exhibited vicious propensities, **even though the dog never had bitten anyone**. The Court noted with approval that such evidence as barking and chasing was "deemed sufficient to present to a jury the issue of whether the owners of the dog were negligent and liable for the plaintiff's injuries which resulted from her attempt to escape from the defendant's dog." *Mongeon*, 733 So. 2d at 172 (citing *Farrior*, 562 P. 2d at 787).

Examining the above case law, the Mississippi Supreme Court, just days ago, clarified the present state of the law in *Olier v. Bailey*, No. 2013-CA-01411-SCT, 2015 WL 1611772, at *6 (Miss. Apr. 9, 2015), with the plurality opinion noting, "[T]he entire purpose of the dangerous-propensity rule is to hold owners liable for the actions of their animals where the owners reasonably could foresee the injury complained of, or where they should have known that any or all of their animals were likely to exhibit behavior that could lead to an injury. *Id.* at *10. In so holding, the Court made clear: gone forever are the antiquated days when "every dog gets one free bite." Indeed, if a victim is required to suffer, shouldn't every bite have consequences?

**1. Prior to the incident involving E.C., Sky had already shown a dangerous propensity or disposition.**

Both Michael Saraco and Amanda Saraco, the Defendants, testified extensively about the animal's disposition and nature prior to the attack. Owner Michael Saraco testified as follows:

**Q.** Okay. So you went to Slidell to the grocery store, you were gone a couple hours, come home. And you said Sky was inside the trailer, and you took him outside and tied him to the telephone pole.

**A.** Yes.

**Q.** And what were you all doing, undoing the groceries?

**A.** Yes, putting the groceries up.

**Q.** Putting the groceries up, okay. And do you know how the girls got together how that happened, your girls and the Cooleys' girls?

**A.** Just from what IS told us is that they wanted to come over. And Shane said, yeah, go over there, so they could come over and play because EC wanted to come over and pet the dog. Sky had just had a bath the night before, we gave it to him, so he was big and poofy. And so she wanted to pet him. And she was petting him, and then when Sky didn't like it, <u>**or just she had gone for his ear**</u> according -- this is just hearsay, this is what IS has told us, that when she went for his ear and he didn't like it, just squared up on her. That's when his paw cut her right there by her eye, knocked her down. Started bleeding and she screamed, and she said the dog just freaked out at that point. That's when we heard, when she screamed, we came out. As we walked out, Sky like stopped and laid down, like, oh-oh, I'm in trouble.

(*See* Deposition Transcript of Michael Saraco attached hereto as **Exhibit "A"** at p. 28-29, L 5-25, 1-5) (<u>**emphasis added**</u>).

**Q.** Okay. What has IS told you about the incident, as we sit here today?

  **A.** That EC came over and wanted to pet the dog. And she was petting the dog, and Sky sat down, he was sitting there, and she said Sky started laying his head back and **she started going for the ears**. **You know, he's a poodle, so he didn't really like that**. She was about to say, don't do that, the words came out of her mouth, she was going to say, all right, you need to leave him alone. She doesn't want you petting him anymore. And when she said that, he just went "kaplunck", **reared up on her and she hit the ground** and she was screaming. Then the dog didn't know what to do, when she started screaming, the dog freaked out and grabbed her.

(*See* **Exhibit "A"** at p. 34, L 6-20) (**emphasis added**).

**Q.** Before biting EC, had Sky were bitten anyone to your knowledge?

**A.** No.

**Q.** Or had he jumped on anyone prior to EC, to your knowledge?

**A.** **Reared up, yeah, he'd rear up**. That was the worst thing he ever did, was **just plunge**.

**Q.** Okay. And would that be his way of greeting someone?

**A.** **We were trying to break him of it**, but he was **really bad** because he liked to, well, I wouldn't say bad. With me, he would just try to almost jump up in my arms or something like that. But he was just like a big lap dog that was **too big to do stuff**. That's one of the things, like EC, I mean, he didn't mean anything, he's just, literally at that time, **Sky might have been a little bit taller than EC**.

**Q.** Yeah. And so you were trying to break him of jumping up **on you and other people**?

**A.** Yes. That was like -- when he first gets out and wound up, he's like, yes.

(*See* **Exhibit "A"** at p. 61-62, L 9-25, 1-4) (**emphasis added**).

**Q.** Let me ask you this: On the day of the incident, would you have approved of EC walking up to Sky and petting Sky in the manner in which she did, or would you have not allowed that?

**A.** With EC, EC is usually just – with her, I'd have made sure I would have been with her **to tell her how to pet him and don't fool with his ears** and just nice and stuff like that because, I mean, we basically put the dog up to protect him from EC, and her kids. Okay.

**Q.** Well, tell me about that.

**A.** They're **just a little over-zealous, they don't know when to stop**.

**Q.** The children?

**A.** Yes.

**Q.** Explain that to me.

**A.** **No manners whatsoever**.

**Q.** Okay.

**A.** And they would – even, we had our cat inside, too. And, you know, surprise the cat because she just would not even know when to stop petting the cat, just leave the cat alone. **She didn't know when an animal is done with somebody petting**

  **and pulling on them**.  I mean, there is no -- I mean, and their dog, they had a little Chihuahua in their house.  Their dog actually bit my wife when we were taking care of the dog.

**Q.**  The Chihuahua?

**A.**  Yes.  But, no, as far as that, if I would have been out there, and I have been out there with the girls and they have petted the dog, **I make Sky sit, and he behaves, and they pet him and they're fine.   I make sure they don't start pulling on his hair or anything else**.

**Q.**  Had you been out there, would you have done that in the same way you have done it before?

**A.**  Yes.  I would have taken him and tied him over there.  You know, he sat and stood, and they just petted all over him.

**Q.**  Would you have been right there?

**A.**  Yes, might have been right there to make sure that the kids didn't do anything bad to the dog.

**Q.**  I mean, that's what it sounded like, what you were saying.

**A.**  Yeah, because our kids pet the dog all the time and have no problem.  But those two girls, EC especially, **had no concept of when to stop**.  So when I put the dog up, it was to protect him from EC.  Because, I mean, if you keep on, if you mess with the dog or are mean to the dog and the dog doesn't like it, **the dog will react**.

(*See* **Exhibit "A"** at p. 63-65, L 9-25, 1-25, 1-19) (**emphasis added**).

Based on the testimony above, and more in his deposition, not only did Michael Saraco understand his large dog's propensity for "rearing up" and similar misbehavior, he also conceded this animal's tender "ears" and its tendency to respond aggressively when his ears were touched or petted. He likewise, in attempting to divert blame, admitted his knowledge of EC's alleged inability to pet his animal because she has "no concept of when to stop." And he pointed out that he often made his dog sit and prevented the children from "pulling his hair or anything." Why would those actions have been necessary, if the dog had not already shown a dangerous propensity or disposition? He even confessed he would have done things differently, given the opportunity. Put simply, his testimony is inconsistent with the proposition that the dog lacked a dangerous propensity or disposition.

His wife and co-owner of the animal, Amanda Saraco, testified in a similar nature throughout her deposition. She stated the following:

**Q.** When did you all first have any discussion or reference to your dog, Sky, that you recall?

**A.** I don't recall, short of just with anybody, it was always, oh, he's cool, and tell me about a poodle, you know, what are they like. And so it's kind of the normal stuff, I think. I remember EC coming up and petting him one time with me, specifically. And it was, again, the pole, he was outside, so I was out walking him in that same area, sit, Sky, you know, did a sign. And then she came up, and I said, **this is how you pet him, you pet his back, because I didn't want her to go for his ears or do anything that -- you know, he's tender-eared**. With any child, that's the way I did it, you may pet him on his back, to touch him. That's it.

(*See* Deposition transcript of Amanda Saraco attached hereto as **Exhibit "B"** at p. 18-19, L 18-25, 1-25, 1-6) (**emphasis added**).

**Q.** When you say her kids, the two girls are with her?

**A.** I don't remember KC being there. I was asking. I remember EC because **she's the one I'm concerned about**, her behavior was just, whoo, and I wasn't really trusting her to be with anybody, with my cat or dog. **Anyway, I put him up so I wouldn't have to worry about her going over the top with the dog**. And I just didn't want to deal with it. So, anyway, she came in and she asked me, she specifically asked me all kinds of questions about why did you put your dog up, why isn't he out here with us, and just really was, I noticed, about the time, and I don't remember a lot of things about that time, but I remember, to me, I thought it was odd about how much she talked about my dog.

**Q.** What did you say?

**A.** I said, well, whenever we're at our big house, four-story house, any time somebody comes over, you know, we assess, like Michael said, the situation, if it's a person that he's used to, sure, you know, he'll stay out. If it's somebody new, I don't want to deal with it. **He might jump, you know**, or I don't want to deal with the whole etiquette thing, with how do you treat a dog. So he goes in the kennel. Pretty much knock on the door, I don't know who it is, kennel this guy, so I'll go kennel him up.

(*See* **Exhibit "B"** at p. 19-20, L 22-25, 1-23) (**emphasis added**).

**Q.** Let me go back. You said that Andrea was particularly curious about why you put Sky up.

**A.** Yeah.

**Q.** What did you tell her?

**A.** Well, what I just told you, at our home normally, you know, I'll put him up if people are coming over **because he's a big dog**. If I had my friends come over, like Ann has had a two-year-old, you know, **I'm not going to have my giant dog just whatever**. I just try to avoid things. So that's why.

(*See* **Exhibit "B"** at p. 21-22, L 21-25, 1-5) (**emphasis added**).

**Q.** What happened next, that you recall?

**A.** I know Michael, for whatever reason, I remember he had just taken his first bite of the mac and cheese, he got done unloading. I was putting things away, and he took a bite of it and was about to go probably get Sky, that would have been our usual routine. And we just heard screaming. And I was standing up near the door. Our kitchen is located here, here's the kitchen, I'm standing on the side like this, came in and saw, go around and there is the door. So, I mean, I was out in no time. When I walked out or ran out, I have the picture in my head, still. It was Sky on top of EC. And just like any other, if you've seen it on TV, a dog attack, it could be National Geographic, "err-err", I mean it was really a lot of action. And I thought he was killing her. I mean, I've seen dogs do that before where they look like they're eating something up, and they haven't done anything. I've actually witnessed that.

    **Q.** Was the dog's mouth on her?

**A.** As far as I could tell, yeah. It was the open mouth and just the "uh-uh-uh", just lots of action. And I saw the blood, I could see it down her face and I could see it down her neck, and I just -- **as soon as I came out, I was, Sky, off, because that's the word I use if he jumps up**, off is the word. And so immediately he just sat down like, oh, man.

(*See* **Exhibit "B"** at p. 25-26, L 15-25, 1-17) (**emphasis added**).

**Q.** Okay. Tell us, as best you can, the story that IS told you.

**A.** Okay. She told me -- again, since I talked to her about it in the sense that, why did you come over here, because our understanding between us two was she would go over there and just play a couple minutes and then come home. So she just said, well, I just decided he was fluffy or something, because he had been bathed.

**Q.** Who is she?

**A.** IS decided that Sky was fluffy or softer than normal, because he had his bath. And so she invited the kids over to pet him, do you want to touch him, because he felt soft. And so that decision was made by IS to come over. Whether Shane knew that was happening, I don't know, and I didn't know what was going on. So, anyway, that is how they ended up there. She said she came up and KC said she declined, she didn't want to pet the dog. Okay. So EC did. And she said EC started petting the top of his head, and he was okay with that. And then she started petting, going on his ears or, you know, he had long hair, silky ears, so I'm sure it was inviting. **And**

      **then she said she could tell Sky didn't like that, and that's consistent with me because I'm his groomer, mostly. Most of the time, he does have a groomer, or he did have a groomer before. But very tender ears. Any time you get them near the comb, he's like, oh, you know, like that hurts, so you don't mess with his ears. And I know that, as his owner, you know, but she didn't know that. So she's going after the ear, and IS told me the body language from Sky was trying to get away, you know, pulling back from her doing that. And she said, I was just starting to tell her, maybe you shouldn't do that, or he looks like he doesn't like that, when he jumped forward**. And he did not bite or do any of that stuff, she said he just jumped on her and knocked her down. And then she started screaming, and she told me that's when things changed with Sky. Then he started the "ahhh" stuff.

**Q.** The more aggressive conduct?

**A.** Yes.

(*See* **Exhibit "B"** at p. 53-54, L 5-25, 1-18) (**emphasis added**).

**Q.** Did you tell Andrea, prior to the incident, that you would sometimes have to put Sky up so that he would not be overly aggressive around strangers?

**A.** No, I didn't tell her that.

**Q.** Okay.

**A.** Yeah, it was more like I was trying to be nice when she came into my trailer the first time. I didn't look at her child and say, **I think you're going to be a monkey and**

> **<u>all over my dog so he's going up</u>**. It was like, well, you know, we could kind of put him up, you know, just to make sure everything is okay. I probably should have told her, **<u>I don't think your child is going to behave around my dog</u>**. You know, maybe I would have prevented some of this. But, no, it was, well, I'll just put him up, I'll put him in the kennel. And sometimes he gets put in the kennel and sometimes he doesn't, in our life. I didn't think it was really much of her business why he gets put up or not put up. And looking back on it, it's all kind of weird. You start looking for things, I think, whenever incidents happen. We had a conversation, but it was limited to he gets put up in the crate, because he does sometimes, and sometimes he does not get put up in the crate, or in the bedroom, as in the case of our camper because I didn't have a crate there. It wasn't our big 4,000-square-foot house.

(*See* **Exhibit "B"** at p. 61-62, L 4-25, 1-4) (**<u>emphasis added</u>**).

Based on the testimony above, and more in her deposition, not only did Michael Saraco understand his large dog's propensity and disposition to cause injury, so did his wife. She recognized similar problematic behavior in Sky and even had a "word" she used to stop him because he would "jump" up so often. As the individual responsible for grooming Sky, she also affirmed this animal's "tender ears" and its tendency to respond aggressively when touched or petted, indicating "so you don't mess with his ears." She likewise, in attempting to divert blame, admitted his knowledge of EC's alleged inability to pet Sky because she believed E.C. was "going to be a monkey and all over my dog" and that E.C. would not "behave around my dog." She also admitted that she "put him up if people are coming over because he's a big dog. If I had my friends

come over, like Ann has had a two-year-old, you know, I'm not going to have my giant dog just whatever." Indeed, why would such an action be necessary, if the dog had not already shown a dangerous propensity or disposition? Like her husband, her testimony is inconsistent with the proposition that the dog lacked a dangerous propensity or disposition.

Moreover, while their communications about the animal, Sky, were limited, Andrea Cooley, the mother of E.C., testified as follows:

> **Q.** Had you ever had any conversations with Michael or Amanda about the dog prior to the date of the incident?
>
> **A.** Yes.
>
> **Q.** Tell me about that.
>
> **A.** We were talking about dogs that were mean and I made the statement that I would never have a dog or animal – would never own a dog or an animal that someone had to be scare of when they came over to my home. And her response – Amanda's response was, "**Well, if you ever came over to our home, we would have to put Sky up**."

(*See* Deposition transcript of Andrea Cooley attached hereto as **Exhibit "C"** at p. 11-12, L 18-25, 1-4) (**emphasis added**).

**2. There is evidence that the Defendants should have reasonably foreseen that Sky was likely to attack someone, particularly E.C.**

Not only is the above testimony proof of a dangerous propensity or disposition on the part of Defendants' dog, Sky, it also make clear the Defendants reasonably could foresee the injury complained of, knowing that Sky was likely to exhibit behavior that could lead to an injury.

*Oliver v. Bailey*, No. 2013-CA-01411-SCT, 2015 WL 1611772, at *10 (Miss. Apr. 9, 2015). Based on Defendants' testimony, this is particularly true for E.C., considering Defendants' descriptions of Sky's rambunctious nature, tender ears, size, and of her E.C.'s alleged behavior before she was viciously attacked.

## IV.

## CONCLUSION

In conclusion, Defendants owned a large animal **(dog)**, which exhibited a dangerous propensity or disposition **(tender ears, jumping, running, rearing, plunging)** prior to the incident at issue. Defendants knew the animal was likely to cause harm **(particularly with E.C., because of her "manners" and inability to "behave")**, and they still failed to exercise reasonable care under the circumstances to control the animal. Their failure to exercise such reasonable care proximately caused serious and lasting injuries to E.C. Consequently, Defendants' Motion for Summary Judgment should be denied.

This the 29th day of April, 2015.

Respectfully submitted,

**E.C., A MINOR, BY AND THROUGH SHANE AND ANDREA COOLEY, AS PARENTS, GUARDIANS AND NEXT FRIENDS, AND SHANE AND ANDREA COOLEY, INDIVIDUALLY**

By: s/ Eugene M. Harlow
*Their Attorney*

**EUGENE M. HARLOW (MSB No. 3086)**
**HORTMAN HARLOW BASSI ROBINSON & McDANIEL, PLLC**
Post Office Drawer 1409
Laurel, MS 39441
601-649-8611 Phone; 601- 649-6062 Fax
gharlow@hortmanharlow.com

* * *

**CERTIFICATE OF SERVICE**

I, Eugene M. Harlow, of counsel for Plaintiffs, do hereby certify that I have this day served the above and foregoing document via electronic transmission and U.S. Mail to:

**Matthew D. Miller**
**Nicholas K. Thompson**
**Copeland, Cook, Taylor and Bush, P.A.**
Post Office Box 17619
Hattiesburg, MS 39404
mmiller@cctb.com
nthompson@cctb.com

THIS the 29th day of April, 2015.

s/ Eugene M. Harlow